UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,

                                     Criminal Case No. 19-20155-2
v.                                    Honorable Linda V. Parker

PRICE HAWKINS,

       Defendant.
_____/

## **OPINION AND ORDER**

On March 20, 2019, a federal grand jury returned a three-count indictment charging Price Hawkins ("Price") and his brother Jesse Hawkins (collectively Defendants) with firearm offenses. Price is charged in one count (Count 3) with Possession of an Unregistered Firearm in violation of 26 U.S.C. §§ 5841, 5861(d) and 5871. The matter is presently before the Court on Price's two motions to suppress his statement to police (ECF Nos. 32, 56), and his motion to suppress evidence recovered from his cell phone. (ECF No. 33.)

The Government has responded to Price's motions. (ECF Nos. 41, 42, 70.) Price filed a reply brief only with respect to his first-filed motion to suppress his statement. (ECF No. 57.) On November 14, 2019, the Court held a hearing with respect to Price's motions to suppress his statement, only.

**Background**

The charges against Defendants arise from the Michigan State Police ("MSP") Department's investigation of drug sales by Jesse at the home he shared with his family in Inkster, Michigan. On June 6, 2018, MSP Detective Trooper Jeff Rucinski signed and submitted an affidavit in support of a warrant to search the home. According to the affidavit, a Canton Township Police Department confidential informant ("CI") reported that a narcotics trafficker with the street name "Lil Jesse" sells marijuana out of the residence, where he lives with his mother, father, and brothers. (Aff. for a Search Warrant at 3.)

The CI reported that Lil Jesse uses a cell phone to conduct narcotic sales and the CI shared that number with law enforcement. (*Id.*) Using a database, officers linked the cell phone number to Jesse. (*Id.*) When shown a photograph of Jesse, the CI confirmed that this was who the CI was referring to as "Lil Jesse." (*Id.*) The CI also was shown a photograph of the residence, which the CI identified as the location where Jesse sells marijuana. (*Id.*) According to the CI, Jesse sometimes had his brothers sell the marijuana for him if he was not home. (*Id.*) The CI indicated that he had purchased marijuana from Jesse at the residence on numerous occasions. (*Id.*)

The CI also informed law enforcement that Jesse has several firearms inside the residence. (*Id.*) According to the CI, Jesse showed him a mini Draco AK-47, a

micro Draco AK-47, an AR-15 (with a 100-round drum), an MP40 submachine gun, and pistols inside the residence. (*Id*.)

Within forty-eight hours of Detective Trooper Rucinski's affidavit, the CI made a controlled purchase of marijuana from Jesse at the Inkster residence. (*Id.* at 5.) The CI reported that Jesse had a pistol on his person inside the residence during the drug transaction and that the CI observed a mini Draco AK-47 in the living room. (*Id.*) The CI does not have a medical marijuana card and had been deemed reliable by law enforcement on at least two previous occasions. (*Id*.)

Detective Trooper Rucinski stated in his affidavit that, based upon training and experience, he knows that drug traffickers usually keep firearms to protect the drugs they distribute and the proceeds from that distribution. (*Id*. at 2-3.) Detective Trooper Rusenski added that drug traffickers also commonly use electronic equipment, including mobile and cellular phones, to aid them in their drug trafficking activities. (*Id*.) Further, according to Detective Trooper Rucinski, drug traffickers take or cause to be taken photographs of themselves, their associates, their property, and their product, which are commonly kept at their residences. (*Id*.)

The search warrant, issued by a judicial officer in Michigan's 36th District Court on June 6, 2018, allowed for the search of the Inkster residence and the seizure of *inter alia* "[a]ny and all communication devices including but not

limited to cell phones and pagers." (*Id*. at 7.) The warrant further authorized

"[t]he search, seizure, manual examination and the forensic examination of any and

all … communication devices …, including but not limited to cell phones …."

(*Id*.) Law enforcement officers executed the search warrant on June 7, 2018.

Jesse, his girlfriend, Price, and other family members were present at the time.

Jesse was in the home's southwest bedroom when the officers arrived. In

the bedroom, the officers found a magazine rifle, marijuana packaged into 23

separate baggies, a digital scale, money (including money whose serial numbers

matched the money the CI used in the controlled drug buy less than 48 hours

earlier), and Jesse's cell phone. Another firearm was found in the kitchen.

Price was in the basement when the officers arrived, which was set up as a

bedroom. His phone, which was on the bed, was seized by the officers. Next to

the bed was a duffle bag containing ammunition and a short-barreled rifle, which is

the subject of the instant charge against him. The officers subsequently reviewed

text messages on and completed a forensic examination of Price's phone.

On March 17, 2019, Bureau of Alcohol, Tobacco and Firearms ("ATF")

agents arrested Price pursuant to a warrant issued in this case and ATF Special

Agent Matthew Rummel ("Agent Rummel") interrogated him. The interview was

recorded, and a copy was filed on the docket. The Government also attached a

partial transcript of the interview to its brief in response to Price's first motion to

suppress his statement.[1]  (ECF No. 41-1.)  In his reply brief, Price indicates that he

"substantially agrees with the Government's transcription of the conversation.

Any differences relate to emphasis and punctuation."  (ECF No. 57 at Pg ID 255

n.2.)

The recording and transcript reflect the following exchange after Agent

Rummel asked Price how long he had been living "here" and confirmed his name:

Agent:      Um, so, you are, you know, so, 'cause you are under
            arrest, before we answer any more of your questions, I
            just want to make sure you are aware of your rights and
            all that stuff. We're just doing everything on the up and
            up. So, you know you have the right to remain silent.
            You have the right to an attorney. If you can't afford an
            attorney, we will provide one with you- to you. I'm sorry.
            Um, at, at our cost. Um, if you decide to answer any
            questions now without a lawyer present, um, you don't
            have to continue to answer questions. You don't have to
            answer all my questions. Um, do you understand those
            rights?

Price:      Yeah, but I actually got a question though.

Agent:      Yeah

Price:      What if I got my license, like, my, my certificate, but
            never took in my papers, stuff like that.

Agent:      Certificate, license for what?

Price:      Uh, for firearms.

_____

[1] The Government supplied a transcript of the portion of the interview it deemed
relevant to Price's first motion to suppress his statement.  The Court has reviewed
the transcript, and listened to the entire recording of the interview.

(ECF No. 41-1 at Pg ID 139.)  Price then began discussing an alleged "certificate" or "license" he had, but that he failed to complete and send in.  (*Id*.)  Agent Rummel next asked Price questions about this paperwork, such as what weapon it is for and where it is located.  (*Id*. at 139-40.)

Shortly thereafter, Agent Rummel asked Price where he got the rifle.  This exchange followed:

Price:     I can't tell you, I don't wanna say bro, without a lawyer, I won't even be talking, I just, just let me tell you about the paper.[2] That's really it.

Agent:     Okay. But, this is for that gun that you're talking about?

Price:     No, I just had, I had the paper, just, I'm sayin' I already had-

Agent:     Oh, oh

Price:     I already had the papers, like, in general. Like, before you guys even came.

Agent:     Right

Price:     That's why I just, I never told you. And, I'm thinking, like, maybe I just…

Agent:     I wasn't out there that day.

---

[2] The Court listened to this statement on the recording multiple times because a change in the punctuation drastically alters its meaning.  For example, a period between "I don't wanna say bro" and "without a lawyer, I won't even be talking" conveys a very different meaning than if separated by a comma (or no punctuation).  The Court believes that the punctuation provided in the Government's transcription accurately reflects Price's pauses (or lack thereof) in this statement.

| Price: | Yeah, that's what I'm saying. Like, I never got a chance to say that. Maybe I'm like, I got a paper. I got the certificate alright. I just never took it down there after they done…. Then, when they say, like, I had a warrant, but I didn't, because I tried to go to Canada. And, they said I had a warrant, but I don't have a warrant. |
|---|---|
| Agent: | Okay |
| Price: | And, then, that's why I'm thinkin,' like, so, how do I have a warrant but don't? That's why I'm— |
| Agent: | Well, this warrant just popped into the system recently. |

(ECF No. 41-1 at Pg ID 140-41.)  After some additional discussion about the warrant, Price's paperwork and the rifle, Agent Rummel asked Price whether he got the paperwork when he bought the gun.

In the exchange that followed, Agent Rummel explained that he had asked Price where he got the gun because, usually, when you get a weapon from a store, they give you the paperwork or registration to fill out and then the store sends it in for you.  Agent Rummel then asked Price whether he did get the rifle from a store, to which Price responded "yes."  When asked what store it was, Price said he could not remember.  Nor could he remember the city.

Agent Rummel next asked Price questions about what kind of weapon it was and the type of ammunition it took.  Agent Rummel then asked Price if he or anyone else had ever shot the rifle before and whether Price had ever let anyone borrow or use it.  Price indicated that the rifle had never been shot and that no one

else had used it. Agent Rummel asked Price a few more times if he was sure that no one else had ever used, borrowed, or fired the rifle, and Price confirmed that he was sure. This conversation followed:

Agent Rummel: I'm asking more for your protection, because we are going to test it and do like ballistics and stuff …

Price: I thought you already did that though.

Agent Rummel: Well if it's used in a crime and you're saying that you're the only one who's ever touched it, then that kinda locks you into being the only one who could have ever used it. Do you see what I mean? Like let's say it comes back to a shooting and you're like I'm the only one who's ever shot it, I'm the only one who's every touched it, no one's ever borrowed it. You're basically admitting that you're the one that did that shooting.

Price: Okay.

Agent Rummel: So, I'm just giving you the opportunity … like, if you're not 100% that somebody maybe could have borrowed it, then don't say that, you know…

Price: Ok, I'll just stop talking then.

Agent Rummel: Ok, alright. Gotcha.

Agent Rummel then proceeded to ask Price other questions about the rifle, such as whether Price definitely bought the gun at a gun store or from someone else and how much he paid for it.

Agent Rummel next asked Price about the modified barrel of the rifle and when it was modified, but Price claimed to have no knowledge as to who modified

it or when.  Agent Rummel told Price that agents had spoken to Jesse about the rifle and Jesse indicated he had been at the range with it.  Agent Rummel asked Price again whether he had ever taken the gun to the range and Price again said no, never.  Agent Rummel asked Price whether the videos at the range in Jesse's phone are him.  Price said no.

The interview concluded shortly thereafter, at which time Price appeared before Magistrate Judge Anthony P. Patti, who released him on bond.

## Suppression of Evidence Recovered from Price's Cell Phone

### Applicable Law

Price asks the Court to suppress evidence seized from his cell phone, arguing that the search warrant failed to establish probable cause for the search and seizure of the phone.  While the affidavit submitted in support of the search warrant reflected that Jesse utilized a cell phone with a specific phone number, Price points out that the warrant allowed for the seizure and search of any cell phone found in the home.  He therefore contends that the warrant was unduly broad.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and provides that "no [w]arrants shall issue, but upon probable cause, supported by [o]ath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. Amend. IV.  "By

limiting the authorization to search to the specific areas and things for which there is probable cause to search," the Fourth Amendment "ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987). Courts therefore interpret the Fourth Amendment's requirements as encompassing two related but distinct concepts: " 'whether the warrant supplies enough information to guide and control the agent's judgment in selecting what to take; and … whether the category as specified is too broad in the sense that it includes items that should not be seized.' " *United States v. Richards*, 659 F.3d 527, 537 (6th Cir. 2011) (quoting *United States v. Upham*, 168 F.3d 532, 535 (1st Cir. 1999)) (additional citations and internal quotation marks omitted in *Richards*). Price focuses on the latter, asserting that the warrant was overly broad and failed to establish probable cause to seize and search phones not belonging to Jesse.

The Sixth Circuit has advised "that the degree of specificity in a warrant must be flexible, depending upon the type of items to be seized and the crime involved." *United States v. Blair*, 214 F.3d 690, 697 (6th Cir. 2000) (citations omitted). Detective Trooper Rucinski's affidavit provided probable cause to issue a warrant to seize and search Jesse's cell phone. *See United States v. Gholston*, 993 F. Supp. 2d 704, 719-20 (E.D. Mich. 2014) (collecting cases finding probable

cause to search a cell phone for evidence of the defendant's drug trafficking); *see also United States v. Sims*, 508 F. App'x 452, 460 (6th Cir. 2012) (citing *United States v. Giacalone*, 853 F.2d 470, 478 (6th Cir. 1988)) (explaining that the "only probable cause necessary" to secure a warrant or wiretap for a cell phone "is that the phone itself is being used in connection with an offense or commonly used by someone committing the offense.").  The harder question is whether Detective Trooper Rucinski's affidavit included facts suggesting that cell phones belonging to Jesse's family members—specifically Price—might contain evidence of drug trafficking.

### Analysis

The affidavit did provide probable cause to also seize Price's cell phone. Information from the CI that Jesse's brothers sometimes sold marijuana for him, in conjunction with Detective Trooper Rucinski's training and experience regarding how cell phones are used by drug traffickers, provided probable cause to believe that evidence of drug trafficking might also be found on Price's phone.  The cell phone's proximity to a firearm—which, according to Detective Trooper Rucinski, may have also been used to facilitate drug trafficking—provided further probable cause for the officers to seize the phone.

Price's reliance on *United States v. Griffith*, 867 F.3d 1265 (D.C. Cir. 2017), is not persuasive.  In *Griffith*, the police obtained a warrant to search the

defendant's home in connection with their investigation of a homicide committed more than a year earlier, for which they believed the defendant had been the getaway driver. *Id*. at 1269. For much of the year, the defendant had been incarcerated on unrelated charges. *Id.* Finding that the affidavit supporting the search warrant "provided virtually no reason to suspect that [the defendant] in fact owned a cell phone, let alone that any phone belonging to him and containing incriminating evidence would be found in the residence[,]" the court concluded that the warrant was not supported by probable cause and was unduly broad. *Id*. at 1270-71. While the affidavit stated that, in the affiant's experience, gang members "'maintain regular contact with each other" and "often stay advised and share intelligence about their activities through cell phones and other electronic communication devices …[,]'" the court concluded that this did not establish probable cause because more than a year had elapsed since the homicide. *Id*. at 1274 ("That assessment might have added force if officers had been investigating a more recent crime.").

Price's cell phone, in comparison, was not plainly unrelated to the alleged crimes and the search warrant was executed within days of the CI purchasing narcotics from the residence. However, even if the affidavit failed to provide probable cause to seize and search any cell phones but Jesse's, the Court believes that the good-faith exception to the exclusionary rule applies.

In *United States v. Leon*, the Supreme Court created an exception to the exclusionary rule for evidence "seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective."  468 U.S. 897, 905 (1984).  Under this good faith exception, suppression is appropriate only if " 'a reasonably well trained officer would have known that the search was illegal despite the magistrate's decision.' "  *United States v. Helton*, 314 F.3d 812, 824 (6th Cir. 2003) (quoting *Leon*, 468 U.S. at 923 n.23).  The *Leon* Court identified four circumstances when an officer's reliance on the magistrate's decision would not be objectively reasonable:

> (1) if the issuing magistrate was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) if the issuing magistrate failed to act in a neutral and detached fashion and merely served as a rubber stamp for the police; (3) if the affidavit was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable, or where the warrant application was supported by nothing more than a bare bones affidavit; and (4) if the warrant was facially deficient in that it failed to particularize the place to be searched or the things to be seized.

*United States v. King*, 227 F.3d 732, 753 (6th Cir. 2000) (citing *Leon*, 468 U.S. at 914-15).  The present case raises only the third scenario.

"A bare-bones affidavit" is "one that states only 'suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge.' "  *United States v. White*, 874 F.3d 490, 496 (6th Cir. 2017) (quoting *United States v. Laughton*, 409 F.3d 744, 748

(6th Cir. 2005)) (additional citation omitted).  In comparison, "an affidavit is not bare bones if, although falling short of the probable-cause standard, it contains 'a minimally sufficient nexus between the illegal activity and the place to be searched.' "  *Id*. (quoting *United States v. Carpenter*, 360 F.3d 591, 596 (6th Cir. 2004) (en banc)).  "If the reviewing court is 'able to identify in the averring officer's affidavit *some* connection, regardless of how remote it may have been'— 'some modicum of evidence, however slight'—'between the criminal activity at issue and the place to be searched,' then the affidavit is not bare bones and official reliance on it is reasonable."  *Id*. (quoting *United States v. Laughton*, 409 F.3d 744, 748 (6th Cir. 2005)).

Here, Detective Trooper Rucinski's affidavit established a "minimally sufficient nexus" between the narcotics activity at the residence and the search and seizure of Price's cell phone.  A reliable confidential informant made a controlled purchase of marijuana from the residence shortly before the warrant was issued. The CI indicated that Price's brothers assisted in Price's drug trafficking activities. Based on their training and experience, the officers also knew that individuals engaged in drug trafficking frequently use their cell phones to aid them in their illegal activities.

For these reasons, the Court is denying Price's motion to suppress evidence recovered from his cell phone.

## Suppression of Statements

Price asserts two arguments in his motions for why his statements during the March 17, 2019 interview with Agent Rummel should be suppressed. In his first motion, Price argues that he invoked his right to counsel, but Agent Rummel failed to honor that invocation and continued to interrogate him. (ECF No. 32.) Price contends in his second motion that, later in the interview, he invoked his right to remain silent, but Agent Rummel again failed to honor his request and continued asking questions. (ECF No. 56.) At the motion hearing, Price's counsel also argued that certain statements during the interrogation—both Price's and Agent Rummel's—should be excluded as irrelevant or unduly prejudicial under the Federal Rules of Evidence.

## Applicable Law

Under the Fifth Amendment, a suspect is guaranteed the right to remain silent and the right to the assistance of counsel during a custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 444-45 (1986). There is no dispute that Price was in custody when Agent Rummel questioned him. Under *Miranda*, a suspect must be advised of his or her Fifth Amendment rights prior to any questioning. *Id*. at 444. A suspect may waive those rights, "provided the waiver is made voluntarily, knowingly, and intelligently." *Id*. In *Edwards v. Arizona*, 451 U.S. 477 (1981), the Supreme Court held that the police must immediately cease their

questioning if, at any time during the interrogation, the suspect indicates that he or she wishes to remain silent or consult an attorney. *Id*. at 484-85. However, even if a suspect has invoked his or her right to counsel or to remain silent, "any information he [or she] then *volunteers* is admissible, provided it did not result from further interrogation." *Tolliver v. Sheets*, 594 F.3d 900, 919 (6th Cir. 2010) (emphasis in original) (citing *Miranda*, 384 U.S. at 478).

Moreover, to trigger *Edwards* and compel officers to end their questioning, "the suspect must *unambiguously* request counsel[,]" *Davis v. United States*, 512 U.S. 452, 459 (1994) (emphasis added), or "invoke his or her right to remain silent[.]" *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010). "Although a suspect need not speak with the discrimination of an Oxford don, he must articulate his desire to have counsel present [or to remain silent] sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney [or to remain silent]." *Davis*, 512 U.S. at 459 (internal quotation marks omitted). In *Davis*, the Supreme Court recognized that good police practice may be for officers to clarify whether or not a suspect actually wants to invoke his or her Fifth Amendment rights when the suspect has made an ambiguous or equivocal statement. *Id*. at 461. Nevertheless, the Court "decline[d] to adopt a rule requiring officers to ask clarifying questions. If the suspect's

statement is not an unambiguous or unequivocal request for counsel [or to remain silent], the officers have no obligation to stop questioning him." *Id.* at 461-62.

Recently, in *United States v. Potter*, 927 F.3d 446, 451 (6th Cir. 2019), the court collected statements it previously found insufficient to trigger *Edwards*, and those it found sufficient:

> Davis's clear command has doomed several *Edwards* claims in our circuit. Take, for example, the statement "I think I should talk to a lawyer, what do you think?" Was that an unambiguous request for counsel? No. *United States v. Delaney*, 443 F. App'x 122, 130 (6th Cir. 2011). How about "'[i]t would be nice' to have an attorney"? Insufficient. *Ledbetter v. Edwards*, 35 F.3d 1062, 1070 (6th Cir. 1994); *cf. Henness v. Bagley*, 644 F.3d 308, 319-20 (6th Cir. 2011). Or "I really should have a lawyer, huh?" Equivocal. *United States v. Mays*, 683 F. App'x 427, 433 (6th Cir. 2017); *see also United States v. Amawi*, 695 F.3d 457, 484-85 (6th Cir. 2012). …

> We have, by contrast, found requests for an attorney unambiguous (triggering *Edwards*) when a suspect told the police that he wanted to be left alone "until I can see my attorney," *Tolliver v. Sheets*, 594 F.3d 900, 923 (6th Cir. 2010), or directed the police to "call his attorney's phone number," *Moore v. Berghuis*, 700 F.3d 882, 887 (6th Cir. 2012). We have even reached that result when a person said "maybe I should talk to an attorney by the name of William Evans." *Abela v. Martin*, 380 F.3d 915, 926-27 (6th Cir. 2004), *abrogated on other grounds by Guilmette v. Howes*, 624 F.3d 286 (6th Cir. 2010). Despite the "maybe" in this statement, we said that the surrounding circumstances—the suspect referred to a specific attorney, the suspect handed the officer the attorney's business card, and the officer said that he would call the attorney—turned what would otherwise be an equivocal request into an unambiguous one. *Id.* …

*Potter*, 927 F.3d at 451. In *Potter*, the Sixth Circuit concluded that the defendant's "mere mention" of an attorney and inquiry as to whether he needed counsel was

insufficient to unambiguously invoke his right to counsel.  *Id*.  "[I]f a suspect

makes a reference to an attorney that is ambiguous or equivocal in that a

reasonable officer in light of the circumstances would have understood only that

the suspect *might* be invoking the right to counsel, [Supreme Court] precedents do

not require the cessation of questioning."  *Davis*, 512 U.S. at 459 (emphasis in

original).

### Analysis – Right to Counsel

Price maintains that he invoked his right to counsel when he responded to

Agent Rummel's question of where he got the rifle and said: "I can't tell you, I

don't wanna say bro, without a lawyer, I won't even be talking, I just, just let me

tell you about the paper.  That's really it."[3]  In this statement, Price did not

unequivocally invoke his right to counsel for all purposes because, in the same

breath, he mentioned counsel and a desire to continue talking to Agent Rummel.

*See Bush v. Warden, S. Ohio Corr. Fac.*, 573 F. App'x 503, 512 (6th Cir. 2014)

(finding that the suspect's statements that he would require an attorney before

revealing who brought the gun that was used in the shooting did not trigger the

---

[3] In his second motion to suppress his statement, Price states that "he invoked his right to counsel at multiple times during th[e] interview."  (*See* ECF No. 70 at Pg ID 343.)  However, the statement above is the only instance Price identified in his first motion to suppress, which is based on his invocation of the right to counsel.  It also is the only time the Court heard Price mention counsel on the recording of the interview.

protections of *Edward*).  Contrary to Price's assertion, his statement did not objectively convey that "he had provided the relevant information [about the certificate or permit] and that he didn't want to answer further questions without a lawyer."  (*See* ECF No. 57 at Pg Id 254.)  Instead, Price's statement ("just let me *tell* you") conveyed that he still wanted to speak with Agent Rummel.  As the Supreme Court restated in *Davis*, when reinforcing the "rigid prophylactic rule" of *Edwards*, "'a statement either is [an unambiguous] assertion of the right to counsel or it is not.'"  512 U.S. at 459 (quoting *Smith v. Illinois*, 469 U.S. 91, 97-98 (1984)).

Nevertheless, "[t]he Supreme Court has held that an accused may invoke his right to counsel for some purposes without invoking it for all purposes."  *United States v. Conner*, No. 90-3470, 1991 WL 213756, at *2 (6th Cir. Oct. 23, 1991) (citing *Barrett*, 479 U.S. 523) (upholding the district court's determination that the defendant's invocation of his right to counsel only with regard to narcotics activities was not an unequivocal invocation of right to counsel and that statements unrelated to narcotics activities need not be suppressed).  Price did convey, unambiguously and unequivocally, that he did not want to answer questions about where he got the rifle without counsel present.  To the extent Agent Rummel thereafter asked any questions about where Price got the rifle, Price's statements in response are suppressed.

## Analysis - Right to Remain Silent

In his second motion to suppress his statement, Price contends that he invoked his right to remain silent when he told Agent Rummel during the March 17, 2019 interrogation: "Ok, I'll just stop talking then."  He asserts that his Fifth Amendment rights were violated when Agent Rummel continued to thereafter ask him questions.  The Government maintains in response that, when viewed in the context of the entire interview, Price's statement was at best limited to the particular line of questioning and was ambiguous.

As set forth above, to invoke the right to remain silent, a defendant must be unequivocal and unambiguous.  *Thompkins*, 560 U.S. at 381.  Price's statement, "Ok, I'll stop talking *then*," was sufficiently clear to invoke his right to remain silent.  Agent Rummel nevertheless continued to ask Price questions.  Any subsequent statements by Price must therefore be suppressed.

## Irrelevant and/or Unduly Prejudicial Statements

To the extent Price maintains that any statements during the interrogation—whether Price's own or Agent Rummel's—are irrelevant or unduly prejudicial, the Court believes that this evidentiary issue is better addressed in a motion in limine raised once the Government indicates which statements it intends to introduce at trial.

## Conclusion

For the reasons set forth above, the Court concludes that the search and seizure of Price's cell phone did not violate his Fourth Amendment rights. Further, Price did not unambiguously invoke his right to counsel for all purposes during the March 17, 2019 interrogation. Price did, however, unequivocally express an unwillingness to answer questions without counsel concerning where he got the rifle. Any discussion on that subject is suppressed. Moreover, Price invoked his right to remain silent when he said "Okay, I'll just stop talking then." Any statements made thereafter also are suppressed.

Accordingly,

**IT IS ORDERED** that Defendant Price Hawkins' motion to suppress his statement based on his invocation of counsel (ECF No. 32) is **GRANTED IN PART AND DENIED IN PART**.

**IT IS FURTHER ORDERED** that Defendant Price Hawkins' motion to suppress his statement based on his invocation of his right to remain silent (ECF No. 56) is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant Price Hawkins motion to

suppress evidence recovered from his cell phone (ECF No. 33) is **DENIED**.

    **IT IS SO ORDERED.**

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: December 5, 2019